**Opinion issued November 29, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00590-CV

———————————

## ELIZABETH HELBING, Appellant

## V.

## OLIVER ALAN HUNT AND JOHN WILLIAM DEAVER, Appellees

---

On Appeal from the 281st District Court
Harris County, Texas
Trial Court Case No. 2009-31060-A

---

## O P I N I O N

Appellant, Elizabeth Helbing, challenges the trial court's rendition of

summary judgment in favor of appellees, Oliver Alan Hunt and John William

Deaver, in her suit against them for negligence.[1]  In two issues, Helbing contends that the trial court erred in granting Hunt and Deaver summary judgment on the ground that they did not owe her a duty of reasonable care.

We reverse and remand.

## Background

In her fourth amended petition, Helbing alleges that in the summer of 2007, she participated in a "student orientation" for incoming freshmen at Texas A&M University known as "Fish Camp," where Hunt and Deaver served as her counselors.  During the subsequent school year, Fish Camp counselors would commonly organize "hang outs" and "formal get-togethers" involving the freshman students.  On the night of September 6, 2007, Hunt and Deaver "decided to take a group of students to a railroad bridge," "climb down from the [b]ridge," "lay on a concrete platform under the railroad tracks," and then "witness a train pass overhead."  Hunt telephoned Helbing to invite her on the trip, telling her that "as she looked back on her time at college, she would be more likely to remember the planned trip to the railroad tracks . . . than she would remember studying for a quiz."  Helbing interpreted Hunt's call as an invitation to an official Fish Camp "hang out."

---

[1]  Helbing also brought a claim against Hunt and Deaver for hazing, upon which the trial court granted summary judgment.  Helbing does not challenge the summary judgment on her hazing claim.

Hunt and Deaver then drove Helbing and three other freshmen to the bridge. Upon their arrival, Hunt and Deaver "led the students on a path down the railroad tracks . . . using only cell phones for lighting." Although Deaver gave the students a "safety" briefing, neither he nor Hunt informed them of "the risk of falling between unnoticeable gaps" in the bridge. Hunt, Deaver, and the students walked across the bridge to "step down onto a concrete platform" that was "at least 30 feet off the ground." After the train passed overhead, the students climbed back up onto the railroad tracks, where Helbing "misstepped into a gap between the end of the railroad ties" and fell to the ground below. She suffered "multiple spinal injuries that rendered her partially paralyzed."

Helbing alleges that Hunt and Deaver had "assumed a position of leadership and trust . . . which she relied upon, and they had a duty to exercise reasonable care in their leadership of the group on the night of the accident." Specifically, she alleges that Hunt and Deaver were negligent in:

a.      leading [Helbing] into an unreasonably dangerous activity;

b.      failing to properly investigate and assess the risks of the activity;

c.      failing to properly disclose to [Helbing] the risks and hazards associated with the activity so that she could make an informed choice about either declining participation in the activity or employing measures such as proper footwear and the use of a flashlight to reduce the risks of the activity; and/or

3

d.    failing to provide proper lighting and instruction to reduce the risk of the activity.

Helbing further alleges that Hunt and Deaver's conduct "constituted a negligent undertaking" giving rise to a duty because,

> 1) Defendants Hunt and Deaver undertook to perform services that they knew or should have known were necessary for [Helbing's] protection, 2) Defendants Hunt and Deaver failed to exercise reasonable care in performing those services, and either 3) [Helbing] relied upon the Defendants Hunt and Deaver's performance, or 4) Defendants Hunt and Deaver's performance increased [Helbing's] risk of harm.

Helbing seeks damages for past and future medical expenses, past and future economic losses, past and future pain and mental anguish, past and future physical impairment, and past and future disfigurement.

Hunt and Deaver filed their answer, generally denying Helbing's allegations and specifically denying that "they were acting in any capacity associated with Fish Camp," "they owed [Helbing] a legal duty to look out for her safety," or "they undertook to perform any services that they knew or should have known were necessary for [Helbing's] protection." In their partial summary-judgment motions on Helbing's negligence claims, Hunt and Deaver argued that "[n]o relationship existed" between them and Helbing that created a legal duty. They asserted that Helbing was a "voluntary participant in the activity in which she was injured." And they further argued that they could not be held liable under a theory of

negligent undertaking because they "did not undertake to provide any services" to Helbing, who was "merely a co-participant" in the trip to the bridge.

In her response to Hunt and Deaver's summary-judgment motions, Helbing argued that Hunt and Deaver owed her a reasonable duty of care "based on their counselor relationship of trust and leadership." Helbing also argued that Hunt and Deaver engaged in a "voluntary affirmative undertaking" by providing "instructions, warning, and leadership" to the freshmen during the trip. She asserted that they provided inadequate lighting and "physical assistance and guidance" to the freshmen while they were climbing on the railroad bridge. The trial court granted Hunt and Deaver's summary-judgment motions.

## Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that he is entitled to judgment as a matter of law and there are no genuine issues of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for summary judgment, he must either (1) disprove at least one element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of his affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341. In deciding whether there is a disputed material fact issue precluding summary judgment, proof favorable to the non-movant must be taken as true, and the court must

indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *Lawson v. B Four Corp.*, 888 S.W.2d 31, 33–34 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

## Summary Judgment

In her first and second issues, Helbing argues that the trial court erred in granting Hunt and Deaver summary judgment because Hunt and Deaver "affirmatively created" an unreasonable risk of harm to Helbing and they failed to exercise reasonable care when they undertook to take the freshmen to the railroad bridge and guide them to witness a train pass overhead.

The common law doctrine of negligence consists of three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987); *Rosas v. Buddies Food Store,* 518 S.W.2d 534, 536 (Tex. 1975). The threshold inquiry in a negligence case is duty. *El Chico*, 732 S.W.2d at 311. A duty is "a legally enforceable obligation to conform to a particular standard of conduct." *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 491 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (citing *Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 233 (Tex. App.—Dallas 1993, writ denied)).

Whether to impose a duty under certain circumstances is a question of law. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). However, this legal question is decided based on the particular facts of the case. *See Sanders v. Herold*, 217 S.W.3d 11, 15 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)). If the facts are disputed, and one version of the facts would support the imposition of a duty, summary judgment is improper. *See Mitchell v. Missouri–Kansas, Texas R.R. Co.*, 786 S.W.2d 659, 662 (Tex. 1990). "The existence of duty is a question of law when all of the essential facts are undisputed, but when the evidence does not conclusively establish the pertinent facts or the reasonable inferences to be drawn therefrom, the question becomes one of fact for the jury." *Id.* (quoting *Bennett v. Span Indus., Inc.*, 628 S.W.2d 470, 474 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.)). Thus, in a summary-judgment proceeding, if the nonmovant's version of the facts would support the imposition of a legal duty, summary judgment for the defendant based on a claim of no duty is inappropriate. *Sanders*, 217 S.W.3d at 15.

Courts determine whether a duty exists by examining factors such as the risk, foreseeability, and likelihood of injury, the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, the relationship between the parties, whether one party had superior knowledge of the

risk, whether that party had the right and ability to control the actor whose conduct precipitated the harm, and any other relevant competing individual and societal interests implicated by the facts of the case. *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 289–90 (Tex. 1996); *Taylor v. Louis*, 349 S.W.3d 720, 734 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Texas courts have long recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation. *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991); *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 120 (Tex. 1976); RESTATEMENT (SECOND) OF TORTS §§ 323, 324A (1965). In recognizing that one may gratuitously undertake a legal duty, the Texas Supreme Court in *Colonial Savings* relied upon section 323 of the second Restatement of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a)   his failure to exercise such care increases the risk of such harm, or
> >
> > (b)   the harm is suffered because of the other's reliance upon the undertaking.

*Colonial Sav. Ass'n*, 544 S.W.2d at 120 (quoting RESTATEMENT (SECOND) OF TORTS § 323 (1965)).

To establish a claim for a "negligent undertaking," a plaintiff must show (1) the defendant undertook to perform services that he knew or should have known were necessary for the plaintiff's protection, (2) the defendant failed to exercise reasonable care in performing those services, and either (3) the plaintiff relied upon the defendant's performance, or (4) the defendant's performance increased the plaintiff's risk of harm. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000). A negligent undertaking requires an affirmative act upon which reliance can be based. *See Entergy Gulf States, Inc. v. Akrotex, Inc.*, 40 S.W.3d 201, 206 (Tex. App.—Beaumont 2001, no pet.).

Hunt and Deaver narrowly frame the duty in question as "the duty not to invite or encourage voluntary participation in an activity." They argue that there is no cognizable duty owed by "one college student" to "another college student . . . based upon mutual participation in a college program, or based upon one student being a class above the other." They assert that Helbing "voluntarily participated in the activity" and they and Helbing were "peers."

However, by so framing the issue, Hunt and Deaver actually disregard summary-judgment evidence that we are required by law to take as true, i.e., evidence that demonstrates that the actions of Hunt and Deaver went well beyond

9

simply extending an invitation to Helbing. The well-established summary-judgment standard of review requires this Court to take all the proof favorable to Helbing as true and indulge every reasonable inference and resolve any doubts in her favor. *See Randall's Food Mkts., Inc.*, 891 S.W.2d at 644.

In her affidavit, Helbing testified that she had no relationship with Hunt or Deaver outside of the Texas A&M University freshmen orientation known as "Fish Camp." At Fish Camp, Helbing was assigned to "Camp Schwede," to which Hunt and Deaver were assigned as counselors. Helbing testified that when Hunt called upon her to attend a Fish Camp "hang out" to "lay under some railroad tracks and watch a train go overhead," he "referenced Fish Camp in his call" and asked her "to go out with a group from Fish Camp." When she told Hunt that she needed to study for a math quiz the next day, he made her "fe[el] guilty for not having accepted prior 'hang out' invitations" by telling her that "in five years you will not remember studying but you will remember something cool like this." Because she had been previously told at Fish Camp "to expect counselors to call [her] during the fall semester to put together 'hang outs' with other campers," she was led to believe that she was being asked to participate in an official Fish Camp "hang out."

In their deposition testimony, both Hunt and Deaver confirmed that Fish Camp counselors were expected to invite freshmen to "hang out" activities over the course of the fall semester. Hunt specifically testified that he had previously

10

sent Helbing an invitation to attend an activity with "some other Fish Camp people." And, after she declined, he felt that the railroad activity "might be a good way to kind of bring her back into Camp Schwede."

Deaver testified that he had been to the bridge on approximately ten or twenty occasions, and he had been told "that it was dangerous to go out there." He stated that the Fish Camp directors would not have approved of the trip to the bridge because it "would seem to be of equal or greater capacity for injury" compared to other activities they had banned, such as riding jet skis. Hunt testified that he knew Fish Camp would not have approved a trip to the bridge because they would be "concerned with the well-being of the freshman." Meanwhile, Helbing testified that she did not know they would be climbing onto a bridge and, if she had, she would have brought a flashlight and would not have worn "flip flops."

Helbing further testified that because she believed the trip to be a sanctioned Fish Camp "hang out," she "trusted" Hunt and Deaver to "not lead [her] into danger" and share "information that they had that was necessary" to "stay out of danger." Although Deaver, as he admitted in his deposition testimony, had been told prior to Helbing's injury that it was "unsafe" and "dangerous" to go out to and climb on the railroad bridge, neither he nor Hunt, according to Helbing, told her "about the dangers or that it was not approved by Fish Camp . . . ." Helbing explained that she was told only that the group was going to "lay out under some

railroad tracks," not that they would be climbing down a railroad bridge. Specifically, Hunt "did not tell [her] that [they] would be going on a bridge, [or] that there was any risk or danger . . . ." She stated that had Hunt and Deaver told her about the dangers or that the activity was not actually approved by Fish Camp, she would not have gone with them on the "hang out."

Helbing further explained that when Hunt and Deaver drove the group to the bridge, she did "not get a good look at it" because "it was dark and [she] was in the back seat of a small car with 2 other people."[2] She wore "flip flops" and did not bring a flashlight because no one had told her that "a slip could result in a fall from a serious height or that [she] would need light to see and avoid stepping into gaps that could lead to a serious fall."

Although Deaver admitted in his testimony that he gave the group a "safety briefing" before going onto and descending the bridge, Helbing testified that she was not informed about the gaps in the bridge. She also noted that their path was illuminated only by the lighting from cellular telephones. Helbing emphasized that Hunt and Deaver "led us freshman out onto the bridge, and we followed."

---

[2] Helbing attached to her response to Hunt and Deaver's summary-judgment motions the affidavit of Dr. Ellie Francis, an optometrist, who testified that because of the low visibility and the use of only cellular phones for illumination, "a normal, attentive person" would have had difficulty in "fully appreciat[ing] the height of the bridge and the terrain surrounding it" or in noticing "the gaps in the area" along the bridge.

12

Helbing explained that she followed Hunt and Deaver because she "relied on their leadership because they were my counselors" and "understood this was something they had done before." She noted that she "could not see the gap" that she fell into and "would not have been standing right next to it or stepped into it had [she] known it was there." In sum, she "would not have fallen through the gap" if Hunt and Deaver "had pointed it out or provided enough light that [she] could see it for [her]self."

Viewing the summary-judgment evidence favorable to Helbing as true, as we must, a fact finder could reasonably conclude that Hunt and Deaver did not simply invite her to go to the railroad bridge, but presented the activity to her as a sanctioned Fish Camp "hang out," which Helbing believed would not place her in any danger. Several of the factors that courts generally look to in determining whether a duty exists may be found in the instant case. *See Akins*, 926 S.W.2d at 289–90. Hunt and Deaver occupied a position of "leadership" and "trust" over the freshmen, presented the event to Helbing as a Fish Camp "hang out," and knew the trip would be too dangerous for the approval of Fish Camp directors.

From the evidence presented, a fact finder could reasonably infer that Hunt and Deaver engaged in an undertaking to perform services necessary for Helbing's protection; they, thus, owed her a duty to exercise reasonable care to perform the undertaking, and they failed to exercise such reasonable care. *See Sbrusch*, 818

13

S.W.2d at 396. Specifically, a fact finder could reasonably conclude that Hunt and Deaver failed to (1) inform Helbing that Deaver had been previously told that the activity was "unsafe" and "dangerous," (2) warn her of the specific risks involved before taking her to the bridge, (3) provide an adequate "safety briefing" upon their arrival at the bridge, (4) explain to her the dangers of going out onto the bridge and climbing down it, (5) warn her about the gap in the bridge that she fell into, or, (6) upon their arrival at the bridge, provide adequate lighting so that she could (a) see how dangerous the activity was, or (b) adequately see the path upon which she was led and the gap that she fell through. *See Stutzman*, 46 S.W.3d at 838. At the very least, a fact finder could reasonably conclude that Hunt and Deaver failed to exercise reasonable care by taking the freshman Helbing on the "hang out" with nothing more than their cellular telephones to light the path upon which Hunt and Deaver led her.

In support of their argument that they owed Helbing no duty of reasonable care, Hunt and Deaver rely on *Rocha v. Faltys*, 69 S.W.3d 315 (Tex. App.—Austin 2002, no pet.). However, *Rocha* involved a fraternity brother who encouraged his fellow fraternity brother to jump off of a cliff into a lake after a party. *Id.* at 318. In holding that the defendant owed no duty to the plaintiff, the court noted that there was "implicit encouragement at most" and "no evidence that Faltys ever actively encouraged, urged, pressured, forced, or coerced [Rocha] into jumping

14

from the cliff." *Id.* at 322. And there was no indication that the defendant occupied a position of "leadership" and "trust," as both Hunt and Deaver admitted in this case, and there was no indication that the defendant presented the excursion as a school-sanctioned activity.

Furthermore, the summary-judgment evidence reveals that the actions of Hunt and Deaver rose above the "implicit encouragement" of the defendant in *Rocha*. Helbing testified that she initially declined Hunt's request that she attend the "hang out" to study for a math quiz, and she believed the event was a sanctioned Fish Camp "hang out." She only agreed to attend after Hunt made her feel guilty for missing other "hang outs" by insisting that "in five years you will not remember studying but you will remember something cool like this." And, as noted above, Hunt and Deaver transported the freshmen to the railroad "hang out" and, once there, Deaver purported to give a "safety briefing" to the students, though the only lighting provided by Hunt and Deaver came from their cellular telephones.

Accordingly, we hold that the trial court erred in granting Hunt and Deaver's summary-judgment motion because the summary-judgment evidence, if believed by a fact finder, would support the imposition of a duty upon them. *See Mitchell*, 786 S.W.2d at 662.

We sustain Helbing's first and second issues.

15

## Conclusion

We reverse the judgment of the trial court and remand the case for proceedings consistent with this opinion.


Terry Jennings
Justice


Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Chief Justice Radack, dissenting.